MEMORANDUM OF DECISION
On October 23, 1997, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Sherail C. to her three children, Tylious, Barrelle and Kaharisma, now ages four, two and one. Also pending were neglect petitions, which were consolidated with the termination petitions for trial. The petitions also seek adjudication of the rights of the biological fathers of the children; Douglas O. and Benjamin T., putative fathers of Tylious, Kent J., the father or Barrelle and Eugene H., Kaharisma's father.
Tylious and Barrelle were placed in foster care on March 10, 1997, after an older sibling, Andre S., suffered a severe unexplained brain injury while in the care of his mother. Andre died a week after the injury on March 18, 1997. Kaharisma, the youngest child was born several months after Andre's death, on May 28, 1997. She was immediately placed in foster care, due to her mother's incarceration from charges stemming from Andre's death. Kaharisma's father, Eugene H., acknowledged paternity of this child on July 23, 1997, after testing revealed him to be the child's biological father. Douglas O. informally indicated, after he was located, that he was Tylious's father. As a result, at trial DCF did not proceed at trial against Benjamin T., the other putative father of Tylious, who had never been located and received notice by publication only.
The court finds that the mother was personally served with the petitions of neglect and for termination and has appeared through court appointed counsel. Service of the petitions on the fathers was as follows: Douglas O. was personally served, Eugene H. was personally served and appeared in court with court appointed counsel. An attorney was appointed for Douglas O., who reported that she had no contact with her client. The court further found that Kent J., located only recently, has received notice by certified mail, return receipt requested at his station in the United States Army in Korea; No attorney was appointed to represent him as he has never expressed any interest in his son. The court finds that proper notice has been given to all parties in accordance with the law. The court has jurisdiction in this CT Page 10341 matter and further finds that there is no pending action affecting custody of Tylious, Barrelle or Kaharisma in any other court
At trial, DCF proceeded against Sherail C. on the neglect grounds that the children are being or would be permitted to live under conditions, circumstance or associations injurious to their well-being. The termination petitions allege that the children have been denied, by reason of an act of parental commission or omission, the care, guidance or control necessary for their physical, educational, or emotional well-being. Connecticut General Statutes § 17a-112(c)(3)(C). The same neglect grounds were alleged against the fathers. The termination petitions alleged abandonment and the failure to have an on-going relationship with the children. Connecticut General Statutes § 17a-112 (c)(3)(A) and (D).
The court heard two days of testimony from two DCF workers, the investigations worker, Michael Smith, and the primary case worker, Lisa Zuccaro, as well as a pediatrician and child abuse expert, Dr. Betty Spivack. In addition, twelve exhibits were introduced into evidence. Sherail C. attended the trial and, through her counsel, vigorously contested the petition. None of the fathers, with the exception of Kaharisma's father, attended the trial.
After the commencement of the trial, on June 2, 1998, the petitioner moved to amend the neglect petitions as to Kaharisma's father, Eugene H., alleging that she was an uncared-for child with specialized needs. The court permitted the amendment. Eugene H. then filed a nolo contendere plea as to these allegations, which plea the court accepted. The court found, from the evidence, that the allegations of the neglect petition had been proven and adjudicated Kaharisma an uncared-for child as to her biological father. DCF also withdrew the termination petition as to Eugene H., which the court also permitted. The court found the agreed-upon disposition to be in the child's best interests and entered an order of protective supervision for a period of one year until June 1, 1999 and set expectations as to Eugene H. On June 18, 1998, after taking evidence that Eugene H. was not prepared to care for the child, despite his earlier resolve to do so, the court (Foley, J.) committed Kaharisma to the care and custody of the Commissioner of DCF for one year. The court permitted the filing of briefs in this matter with the last day for filing extended to August 7, 1998. CT Page 10342
 1. THE AMENDMENT
As a preliminary matter, the Respondent mother argues that the court's granting of the motion to amend as to Kaharisma and her biological father was in error, that the agreed-upon disposition was prejudicial to her client and that the testimony presented on June 18, 1998 should not have been taken and was also prejudicial to her client. Amendments in the Superior Court for Juvenile Matters are controlled by Connecticut Practice Book § 35-1 (Rec. 1998), which states in relevant part:
 "(3) A petition may be amended at any time by the court on its own motion or in response to the motion of any party prior to any final adjudication. When an amendment has been ordered, a continuance shall be granted whenever the court finds that the new allegations in the petition justify the need for additional time to permit the parties to respond adequately to the additional or changed facts and circumstances."
Respondent mother, through her counsel, made no request for a continuance or any claim that she needed additional time. The amended allegations in the neglect petition did not relate to the respondent mother and as such, had no impact upon her. At trial, respondent mother reserved the right to argue that it was prejudicial, but has not, either at trial, in her brief or reply brief, specified in what way the amendment has prejudiced her. The court is unable to discern any prejudice.
In general, amendments are liberally permitted, subject to issues of fairness to opposing parties, the length of any delay and the reasons for the amendment. Unless there is a sound reason to deny the request to amend in order to remedy pleading issues, a request to do so should be granted. Falby v. Zarembski,221 Conn. 14, 24, 602 A.2d 1 (1992). In the context of termination of parental rights matters, the appellate court found there was no abuse of the court's discretion in granting an amendment on the eve of trial. In re Carl O., 10 Conn. App. 428, 437,523 A.2d 1339, cert. denied, 204 Conn. 428 (1987). More recently, in concluding that an amendment was properly allowed, the court stated:
 "We will not disturb a trial court's decision to allow amendments to the petition unless there has been an abuse of discretion. Since the rules of practice allow amendment, we cannot say that the trial court abused its discretion in this case by allowing the amendment of the CT Page 10343 termination petition." In re Angelica W., 49 Conn. App. 541, 548
___ A.2d ___ (1998).
In this case, permitting the amendment caused no surprise or unfairness, occasioned no delay and did not add any trial burdens to the respondent mother's case which were not already known to her. The Respondent mother's claims regarding the motion to amend are to no avail and are denied.
Respondent mother also claims her Due Process rights were violated because she was not included in the discussions between the petitioner and respondent father concerning the agreement to place the child with the father under protective supervision. Those discussions, as far as the court is aware, were settlement discussions and not necessarily something to which all parties would, in the ordinary course of practice, be included. Further, such vague constitutional arguments must be viewed in the context in which they arise. Mother, incarcerated for a term which will exceed her children's minority, is not in a position to be a placement resource for them, nor has she offered others as such a resource. She did not request to be heard on the proposed disposition or object to it. On June 5, 1998, when the court was first informed about the new concerns about Kaharisma's placement, she likewise did not request to be heard or to offer evidence on disposition and what was in the child's interest. The court continued the matter to June 18, 1998, to determine what is in the child's best interests. On June 18, 1998, the mother did not come forward to argue her constitutional claim. Further, the commitment of Kaharisma to the Commissioner is the proposed disposition the respondent mother had expected prior to the amendment, to which she also took exception.
The court holds that it is not sufficient, for purposes of making a claim of a constitutional deprivation, to simply allege its occurrence. Respondent mother does not specify in what way her rights were impacted. She failed to take any action to bring her concerns to the attention of the court at the time in which the court could have acted upon them. Ample opportunity existed at trial and at the continued hearing on the disposition for Kaharisma to be heard, while respondent stood mute. For these reasons, the court will not entertain this claim and dismisses it as unfounded and without merit.
2. FACTS
CT Page 10344
A. As to the Mother, Sherail C.
From the evidence at trial, the court finds the following facts:
Sherail C., now age twenty-three, was herself a foster child and was still in foster care when her oldest child Jerelle was born in October of 1992, before his mother's eighteenth birthday. Jerelle is in the guardianship of relatives and is not involved in the cases pending before the court. Sherail experienced severe neglect and physical abuse as a child and the multi-generational effects of such abuse and numerous out-of-home placements are visible in her adult life.
To her credit, Sherail was working on her high school equivalency diploma and had been employed as a cashier in the past. Nonetheless, despite her efforts, DCF has been involved with Sherail and her children since May of 1993, when she left Jerelle with an aunt and did not return. Jerelle was never again returned to her care. At that time, DCF focused on Sherail's lack of parenting skills and provided her with various supportive services. On February 2, 1994, Sherail gave birth to Tylious, then Andre on December 26, 1994, Barrelle on April 14, 1996, and on May 28, 1997, she gave birth to her fifth child, Kaharisma. In the space of a little over five years from age seventeen to twenty-two, she became the mother of five children. These five children all have different biological fathers, none of whom was ever involved with the children or assisted in their care.
Services provided to Sherail started in 1994 with maternal and infant care assistance, both pre- and postpartum with the St. Francis Home Health Program. She also received parent education. In 1996, Sherail received intensive family preservation services from the Klingberg Family Preservation Program which included the services of a home health aide to assist her with the care of her children. Andre, who was a special-needs child, received assistance with the Birth to Three program before his death. The goal of DCF during this time was to provide support services to Sherail and education to enhance her parenting skills.
Concerns about neglect and possible child abuse by Sherail surfaced prior to March of 1997. Andre was removed from her care briefly on June 3, 1996, when his grandmother was concerned about severe cold sores, his fever and general lethargy. The resulting DCF investigation did not confirm either abuse or neglect. Andre was returned home with an agreement with Sherail for more in home CT Page 10345 services, which she did utilize. During that same summer, all three children were briefly removed on July 29, 1996 when Andre suffered a febrile seizure. Again neglect could not be substantiated and the children were returned with additional services to the mother. In August, the extensive services provided by Klingberg began with parent training, in home visits and instruction concerning parenting. In the fall of the year, the parent aide reported concerns about Sherail's treatment of Andre, believing that the child was treated differently from the other children.
At the time both Tylious and Barrelle were placed in foster care, there was no evidence to support that either child had been physically abused by their mother. They appeared healthy. Ms. Zuccaro, the DCF caseworker, testified that she met with Sherail prior to the removal of the children from 1996 to 1997 approximately thirty times. During her visits, the children appeared well-cared for. She did not see any signs of abuse and believed that Sherail not only participated in the services offered to her, but had learned and benefited from them.
Tragically for Andre and the other children, physical abuse of Andre must have occurred at some point during this time, as testified to by Dr. Betty Spivack. Dr. Spivack, a pediatrician and recognized expert in child abuse, was involved in Andre's care starting on March 10, 1997 when he was first brought to the Connecticut Children's Medical Center. She received consult requests from the police department, DCF and the pediatric surgeon and was the physician responsible for some of the child's critical care. She stated that the child was then twenty-six months old and was unconscious and in varying states of coma until his death a week later. "He had several injuries", she stated, "some of which were noted immediately and some as time went on. The most serious was his brain injury which led to his surgery. He had a large acute subdural hematoma which caused a great deal of swelling and was putting pressure on the brain. He had bruises on his head, on the right, one at the midline and one on the left which were compatible with his injury. The sagittal sinus", she testified, "the large vein which drains most of the brain, was torn and was the source of the tremendous amount of bleeding within the brain."
She testified that the "first CAT scan prior to surgery was highly suggestive of an old subdural hematoma. " As the surface was altered by the surgery, she could not definitively say it had CT Page 10346 existed. She also found looped cord marks on Andre's back which were scarred and of an indeterminate date. There were also other small scars in various places on Andre's body to which she could not assign causes or dates. The looped cord scars were consistent with being hit with a looped cord for discipline reasons.
Dr. Spivack testified that abusive brain injuries are the most common means of fatal child abuse and that she has seen many. "This injury is at the far extreme of even fatal head injuries in that the forces that caused the injury were able to cause the tearing of the sagittal sinus without an overlying skull fracture . . . The only way the vein gets torn is with a tremendous sheering effect and an extremely forceful impact of the brain inside the skull. " She found the injures to Andre were not accidental and testified that "accidental injuries of this kind can happen, but because they involve such major forces that a well-documented history is available at the time." She noted that car accidents or a fall from a height of five stories or more could cause such an injury, although most likely under such circumstances a skull fracture would be present as well. "In the absence of a clearly delineated history with the child at home, there is no accidental mechanism which explains these injuries . . . Because the rotational and sheering forces on the brain were so very considerable, the head was moving very rapidly," she stated, "and indicates that rather that being held at the chest, (the child) was held by the lower portion of his body, perhaps the ankles, swung and his head contacted a large flat surface, a door, floor or wall, something with no edge because there was no abrasion and no depressed skull fracture."
The various explanations given by Sherail, who was the only adult in the home with Tylious, Andre and Barrelle, could not have caused this extremely severe injury, Dr. Spivack, concluded. As a result of the child's injury, DCF removed Tylious and Barrelle and placed them in foster care. In May of 1997, as previously indicated, Kaharisma was also removed from her mother's care. Soon after Andre's death, Sherail was charged with homicide. In November of 1997. she entered a guilty plea to a reduced charge of manslaughter and was sentenced to imprisonment for a period of thirty years. She has been incarcerated since March of 1997 and it is expected she will serve eighty percent of her sentence or until the year 2021.
Dr. Spivack testified to the impact and consequences of Andre's abuse and death on the other children in the household. CT Page 10347 The turmoil in the household with the emergency care professionals arriving and the child being removed as well as the mother would have been traumatic. She stated that in the literature about "fatal child abuse and abusive head trauma, the death of a prior sibling due to abuse is the single highest risk factor of a subsequent death if the other children are left in the environment where the abuse occurred. The likely impact on Tylious", she stated, "who is approximately four years old — a time death is not understood, but when violent events are frequently remembered — would have been traumatic and the events of the last year, including his out-of-home placement, would expected to have a marked impact on his life." The evidence has subsequently supported her opinion as in the first year of his foster home placement, Tylious experienced periods of wetting and soiling. He has been in the care of a therapist at the Village for Families and Children and continues to receive such care at the present time, to help him cope with the issues surrounding the death of his brother and his mother's incarceration.
Barrelle, on the other hand, was pre-verbal and not yet a year old when Andre died. For him, the impact is less the memories of the traumatic experiences in the home than the out-of-home placement, Dr. Spivack testified. She stated that "all children who enter out-of-home placement for whatever reason have major problems related to disruption and the placement. Those problems are magnified when the circumstances of the placement do not permit the reinstitution of the nuclear family. Also as the children age and understand the nature of what happened to their brother and the reason their mother does not take care of them, this will raise issues about — why did this happen, what does it mean about me — am I going to do something like this. " These are problems which require therapy and are magnified when there is no sense of security associated with a permanent plan and family setting for those children."
The immediate effects of the death of Andre on the surviving siblings have begun to fade. At the present time, both Tylious and Barrelle are doing well in the foster home where they have been for some time. Tylious is doing well in preschool and Barrelle and his brother are strongly attached to each other and their foster parents. Their foster parents wish to adopt the children, if possible. Kaharisma was doing well with the foster parents where she had been placed.
B. The putative fathers of Tylious and Barrelle:
CT Page 10348
Douglas O. and Kent J.
Sherail named Douglas O. as the father of Tylious on August 12, 1997. He was located at his place of employment by DCF. He acknowledged that he is the father of Tylious to the DCF. Nonetheless, since that time, he has not had any further involvement with DCF. He has had no involvement with Tylious. He has not inquired about his welfare, written him, paid support or provided funds for his care. He has no relationship with Tylious. Kent J., the father of Barrelle, was located serving in the U.S. Army in Korea. He, too, has never contacted DCF about his son, sent cards or gifts and never visited with him. He has no relationship with this child.
3. ADJUDICATION
A. Neglect Petitions as to all three children.
(1) Tylious
The court concludes by a preponderance of the evidence that as of March 13, 1997, that Tylious, if returned to his mother, would be permitted to live under conditions, circumstances or associations injurious to his well-being. Her physical abuse of Andre, who was in intensive care at that time, and her incarceration made it impossible for her to provide an appropriate home. Douglas O. was not available to his son and had no connection to him. Even if his physical location had been known, placing Tylious with an individual who had exhibited no concern for him would be to permit him to live under conditions, circumstances or associations injurious to his well-being. The court adjudicates Tylious a neglected child.
(2) Barrelle
The court also concludes by a preponderance of the evidence that as of March 13, 1997, that Barrelle, if returned to his mother, would be permitted to live under conditions, circumstances or associations injurious to his well-being. As previously found, her physical abuse of Andre, who was in intensive care at that time, and her incarceration made it impossible for her to provide an appropriate home. Kent J., the biological father, was not available to his son, Barrelle, and had no connection to him. As in Tylious's case, even if his CT Page 10349 biological father's physical location had been known, placing Barrelle with an individual who had exhibited no concern for him would be to permit him to live under conditions, circumstances or associations injurious to his well-being. For the foregoing reasons, the court therefore also adjudicates Barrelle a neglected child.
(3) Kaharisma
The court concluded by a preponderance of the evidence that as of June 2, 1997, the date of the amendment of the neglect petition filed as to Kaharisma, that she is an uncared-for child. Her mother's incarceration made it impossible for her to provide an appropriate home. She is not now nor will she at any time during the child's minority be in a position to care for the child. The court has adjudicated Kaharisma an uncared-for child and committed her to the care and custody of the commissioner for a period of one year on June 18, 1998. (Foley, J.)
B. Termination Petitions:
(1) Douglas O. and Kent J.
The court finds by clear and convincing evidence all grounds alleged against Douglas 0. and Kent J. have been proven by DCF. The first of those grounds, abandonment, focuses on the parent's conduct. In re Michael M., 29 Conn. App. 112, 614 A.2d 832
(1992); In re Rayna M., 13 Conn. App. 23, 36, 534 A.2d 897
(1987); In re Kezia M., 33 Conn. App. 12, 632 A.2d 1122 (1993). "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). Neither biological father has pursued visitation with the children, has displayed love, affection or concern for them. Both have abandoned these children completely.
Neither biological father has an ongoing relationship with his son. "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." In re Midaglia M.,6 Conn. App. 194, 211, 504 A.2d 532 (1986); In re Juvenile Appeal (84-3), CT Page 103501 Conn. App. 463, 473 A. A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984); In Re Juvenile Appeal (Anonymous),177 Conn. 648, 670-671, 420 A.2d 875 (1979). That question is answered by the clear and convincing evidence before the court. The relationship between Tylious and his father, Douglas O. and between Jarrelle and Kent J. never came into being. Neither man has done anything to create a relationship and there is no reason to believe that there is any future hope for such action on their part. Even with the children in out-of-home placement, they have not demonstrated any interest in caring for either of them.
(2) Sherail C.
The termination petitions as to all of the children allege that they have been denied by their mother, by reason of an act of parental commission or omission, the care, guidance or control necessary for their physical, educational, or emotional well-being. Connecticut General Statutes § 17a-112(c)(3)(C). The court is mindful of the fact that there has been no evidence of physical abuse of Tylious, Barrelle or Kaharisma by their mother. However, "There is nothing in this clear statutory language that limits the acts of commission or omission to the serious physical injury of a child, rather than the serious emotional injury to a child. . . . The language does not limit the grounds to acts resulting in physical injury." In re Sean H., 24 Conn. App. 135,144, 586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078
(1991). In re Kelly S., 29 Conn. App. 600, 614, 616 A.2d 1161
(1992).[2]
The case of In re Sean H. dealt with a non-custodial father who stabbed his ex-wife to death in the presence of four of the couple's five children. A fifth child, Sean, was a psychiatric patient at the time of the stabbing as the result of physical abuse inflicted upon him by the father. The Appellate Court upheld the trial court's determination terminating parental rights under this statute, noting that the non-custodial father's act of murdering the mother inflicted serious emotional injury upon all of the children.
The respondent mother in her brief does not raise factual claims against a finding that the grounds for the petitions have been proven, but argues that this section of the statute is unconstitutional, because it is void due to vagueness and that the thrust of the statute is to impermissibly shift the burden of CT Page 10351 proof to the respondent in violation of her Due Process rights.
A constitutional challenge to the predecessor statute, Connecticut General Statutes § 45-61f, on the grounds of vagueness was mounted in the case of State v. Anonymous,179 Conn. 155 (1979). The underlying concern in a "vagueness" attack is that "it does not inform an ordinary person of what conduct is required, or must be avoided, in order to prevent the termination of parental rights." (Anonymous at page 163). Noting that most frequently, such attacks are made in the criminal context, the "United States Supreme Court has held that civil statutes are susceptible to vagueness challenges as well."
 At the time State v. Anonymous was decided, the Connecticut statute read as follows:
 (2). . that the child has been denied, by reason of acts of parental commission or omission, the care, guidance, or control necessary for his physical, educational, moral or emotional well-being whether such denial is the result of physical or mental incapacity of the parents or conditions attributable to parental habits, misconduct or neglect, and these parental acts or deficiencies are such as to support the conclusion that the parent cannot exercise, or should not, in the best interests of the child, be permitted to exercise parental rights and duties. ." (emphasis added).
The highlighted phrases are identical to those in the present section of the statute, but the explanations which follow have since been removed by subsequent amendments and the sentence in the present statute which now follows the highlighted portion is:
 "nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights."
The court will examine the sections in the order in which they appear. In State v. Anonymous, Justice Loiselle concluded, after a review of the portion of the statute identical to the present version,
 "To withstand a vagueness challenge, a statute must state its standard with adequate clarity and mark sufficiently distinct boundaries for the law to be fairly administered. Lack of precision, however, is not, in and of itself, offensive to the requirement of due process. Roth v.CT Page 10352 United States, 354 U.S. 476, 77 S. CT. 1304, 1 L.Ed.2d 1498 (1957). Our review . . . shows that its requirements are sufficiently clear and explicit: The evil that has to be avoided is any conduct on the part of the parent that would deny the child in question the care, guidance or control that will foster his well-being. "Well-being", according to the statute, has physical, emotional, education and moral components.
Speaking of those sections which are no longer contained in the present statute:
 "it is true that these somewhat general phrases encompass a wide variety of conduct, but the process of parenting itself is multifaceted and encompasses all of life's activities. In view of the diversity of human nature, backgrounds and capabilities, and the differing aspirations of families in our society, it would be impossible to delineate specific conduct as acceptable or unacceptable. What might be totally unacceptable parental behavior in one situation (the deprivation of certain material goods) might be an unfortunate but unavoidable fact of life in a different family situation."
The court concludes, even though there have been some significant changes in the statute since this careful analysis by the Connecticut Supreme Court, that the statute is sufficiently clear to provide parents with notice of the general nature of the conduct to be avoided. It is noteworthy that even in the almost twenty years that have elapsed, the major portion of the statute advising of the conduct to be avoided remains unchanged.
As the Anonymous court noted, it would be impossible to delineate the specific conduct which is acceptable or unacceptable under the statute. Nonetheless, in adding the second sentence concerning non-accidental or unexplained serious physical injury to a child, the legislature has identified specific conduct to be avoided under all circumstances. However, in carefully reviewing the second sentence of this section of the statute together with the entire structure of Connecticut General Statutes § 17a-112, this court cannot conclude, as does respondent mother, that the statutory section is applicable under these facts. The court interprets the sentence to refer to the children, who are the subject of termination petitions. Sherail's living children have not suffered from nonaccidental or unexplained serious physical injury and there has been no evidence of such conduct before the court. The court is of the opinion that if the legislature had meant to include deceased siblings of the children before the court, it would have so CT Page 10353 specified[3] Because the court holds this statutory language inapplicable to this case, respondent mother's arguments pertaining to the shifting of the burden of proof will not be addressed further.[4]
In this case, Sherail caused the physical injury which lead to the death of Andre, the two boys' middle sibling and Kaharisma's older brother. By doing so, she inflicted serious emotional injury on her other children and caused the events which led to her permanent, premature removal from their lives. Her acts of commission as to Andre may be viewed as acts of commission toward Tylious, Barrelle and Kaharisma, but in the case of the three surviving children, the acts were not physical, but emotional. Her conduct will reverberate throughout their lives and in particular will require them to deal with this horrific event and its implications in their lives, as Dr. Spivack concluded. The court finds, from the clear and convincing evidence, that Sherail has inflicted serious emotional injury on Tylious, Barrelle and Kaharisma.
The court must also state that the facts supporting the termination have existed for more than one year or that reasons for a waiver exist. The petitioner in this case requests that the one year required be waived under the totality of the circumstances to promote the best interests of the children and because a sibling of the children has suffered nonaccidental or inadequately explained death as a result of parental acts of omission or commission. Connecticut General Statutes § 17a-112(d). Connecticut General Statutes § 17a-112(c) provides for the waiver of the one year requirement and states:
 "The court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child."
Determination of the question of a waiver is within the trial court's discretion. In r e Romance M., 30 Conn. App. 839 (1993).
Kaharisma was adjudicated an uncared-for child on June 2, 1998. The court today has adjudicated Tylious and Barrelle neglected children. The termination petitions were filed on October 23, 1997. The time from which to measure the passing of one year was analyzed by the Appellate Court which stated in CT Page 10354 regards to the identical, but differently numbered section of the statute:
 ". . . We do not determine the statutory year as legally requiring any fixed starting date. The statutory requirement is. simply that, at the time of the adjudication, statutory grounds exist for the termination of parental rights, and that those grounds must have existed for not less than one year. The statute does not say' one year from the date of placement or `one year from the date of commitment'. It requires only that the ground exist for not less than one year. This is so regardless of the status of the child. The child may be in placement, in commitment or still at home, being cared for by grandparents, siblings, other relatives or strangers and may at the same time be subject to parental behavior amounting to grounds for termination of parental rights." In re Saba P., 13 Conn. App. 605, 609, 610, 538 A.2d 711 (1988).
This Court adopts the reasoning set forth and concludes that the one year statutory requirement was met. For the two oldest boys, the measuring date is the time of the injury to their brother, Andre, March 10, 1997, more than a year ago. For Kaharisma, the measuring date, as she was not yet born, is the date of her birth in May of 1997, also more than a year ago. Even though no termination petitions were filed until October of 1997, the grounds existed for not less than one year prior to the termination and the court so finds. Even if a waiver were required, it is in the best interests of all three children to waive the time period. The court has previously found that a sibling of the children, Andre S., suffered a non-accidental death as a result of an act of parental commission. The mother is incarcerated and will remain incarcerated until well after the children attain the age of majority, The fathers of Tylious and Barrelle have been uninvolved and absent from their children's lives. The court concludes, from all the circumstances in this case, that it is in the best interests of all three children to waive the one year requirement and it is so ordered.
 4. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e), noting that the termination petition has been withdrawn as to Eugene H., the father of Kaharisma:
1) Appropriate and timely services were offered by the Department of Children and Families, including counseling, CT Page 10355 educational services, and parenting classes. While Sherail complied with the services to prevent removal of the children from her, those services did not prevent the appalling acts which took the life of Andre and emotionally injured Tylious, Barrelle and Kaharisma. No services were offered to the fathers of Tylious and Barrelle as neither has ever come forward to claim his child.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to permit the children to remain with their mother, given the situation and circumstances, as far as possible. Prior to Andre's injury, considerable support services, counseling and parent education were offered to Sherail. After his injury, no further efforts were possible. No efforts were made as to the fathers as to do so would have been futile.[5]
3) The DCF entered into reasonable and realistic service agreements in order to keep the children in Sherail's home until her abuse of Andre.
4) The boys have strong emotional ties with the foster family who have provided the physical, emotional and educational support these children now need. Their attachment to their mother is lessening. Kaharisma has begun establishing such bonds.
5) Finding regarding the age of the children. Tylious is four years old and Barrelle is two years old. Kaharisma is almost fifteen months old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. While Tylious has kept in contact with DCF concerning her children, she cannot adjust her circumstances so that she could provide for them. Neither of the fathers has done anything to adjust their circumstances to make it in the best interests of Tylious and Barrelle to be returned to them.
7) Finding regarding the prevention of the parents from CT Page 10356 having a meaningful relationship etc. DCF has taken many steps to encourage the mother to retain the children in her household prior to March 10, 1997. She did not benefit from those steps. As to the fathers of Tylious and Barrelle, DCF has taken no steps as they were both unavailable and uninvolved in either child's life.
 5. DISPOSITION
Tylious and Barrelle were placed in foster care together. They have remained in the same foster home together and are doing well there. They have a positive relationship with their foster family and are bonded to them. Their foster parents have expressed an interest in adopting the two boys. Neither their mother or either one of their fathers is available for them, nor are there any extended family members who are willing to become a resource for these boys.
Kaharisma is committed to the Commissioner for a period of one year and has been placed in foster care. It is expected that she will have regular contact with her biological father. The court, nonetheless, concludes from all the evidence concerning her mother, that it would be in this child's best interest to terminate her mother's rights to her and to permit her in the future to fashion a life free of her biological mother's claims.
There is no one other than the foster parents who can provide Tylious and Barrelle with any opportunity for sustained development and well-being and the permanency these children need. It remains to be seen whether Eugene H., Kaharisma's father, can be reunited with her. The court concludes, based on all the evidence, that termination of the parental rights of their mother, Sherail, is in their best interests. Accordingly, a termination of the parental rights of Tylious C. to Tylious, Barrelle and Kaharisma is ordered. The court further orders that the termination of the parental rights of Douglas O. to Tylious, and Kent J. to Barrelle. It is further ordered that the Commissioner of the Department of Children and Families be the statutory parent for the two boys for the purpose of securing an adoptive family and permanent placements for them. If their present foster parents remain willing to adopt Tylious and Barrelle, it is the court's direction that they be given first consideration. Kaharisma, as previously ordered, shall remain a committed child. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placements and file CT Page 10357 further reports as are required by state and federal law.
Barbara M. Quinn, Judge Child Protection Session